IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| **GEORGE LEUS,**<br><br>**Plaintiff,**<br><br>v.<br><br>**C.R. BARD, INC., et al.,**<br><br>**Defendants.** | Case No. 4:13-cv-00585-NKL |

## ORDER

Before the Court is Plaintiff George Leus' Motion to Exclude or Limit the Opinions and Testimony of Christopher Morris, M.D. *See* Doc. 221. In Morris' expert report he opines on the causes of Leus' injuries. Leus moves to strike certain opinions in Morris' report on the grounds that: they violate a stipulation, they are irrelevant or confusing, Morris is unqualified to give them, and there is no reliable basis to support them. For the reasons stated below, Leus' motion is granted in part and denied in part.

### I. Background

#### A. Factual Background

Leus is a 46-year-old man who resides in Missouri. Doc. 377-2 (Morris' Expert Report), at 5; Doc. 4 (Amended Complaint), ¶ 1. In 2008, Leus' physician, Dr. Khan, implanted Bard's G2 filter into Leus in anticipation of bariatric surgery. Doc. 377-2, at 5. This filter was not removed despite the surgery not being performed. *Id.* Leus alleges that in July of 2012, Bard's G2 filter tilted and punctured his inferior vena cava ("IVC"). Doc. 4, ¶ 45. This puncture allegedly caused immediate back pain and internal bleeding. *Id.* The internal bleeding caused blood clotting, otherwise known as deep vein thrombosis ("DVT"). *Id.*; Doc. 377-2, at 53-54. Leus reported to

1

the hospital. *Id.* at 56. His back pain worsened, and his legs became increasingly painful and swollen. *Id*. His legs then alternated between being very painful and becoming numb. *Id.* at 56-57. *Id.* Leus was transferred to Heartland Regional Medical Center. *Id.* at 57. Doctors eventually performed bilateral above-the-knee amputations. *Id.* at 16. During recovery, Leus' scrotum continued to experience significant pain, and a scrotectomy was eventually performed. *Id.* at 18-19.

### B. Morris' Expert Report

Morris' report provides 13 opinions over 11 pages. Doc. 377-2, at 49-60. In relevant part, Morris opines that: Dr. Khan should have followed up with Leus and removed Leus' IVC filter after his surgery did not occur; the IVC filter may have been tilted at the time of implantation; the IVC filter likely prevented a pulmonary embolism; Leus' amputations and scrotectomy would have been prevented if Leus had received proper medical care; and Leus' back pain, anxiety, and depression were not caused by his IVC filter. *Id.* at 49-60. Morris bases his opinions on his review of the relevant medical records and his experience working with IVC filters. *Id.* at 1.

Morris is an interventional radiologist with 29 years of clinical experience. *Id.* at 2. His work includes the placement and retrieval of IVC filters as well as the care and management of patients with IVC filters. *Id.* Morris has taught students and colleagues about IVC filters. *Id.* at 3. He has also published peer-reviewed articles on IVC filters. Doc. 377-2, Ex. A (Morris Resume), at 8-11. He has implanted 800 IVC filters and helped with multiple IVC filter retrievals. Doc. 377-2, at 4.

### II. Legal Standard

Bard has the burden to prove the admissibility of Morris' expert testimony by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)

2

(stating the proponent of the expert testimony bears the burden of proving its admissibility). To be admissible under Fed. R. Evid. 702, expert testimony must pass a three-part test. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, No. 19-2899, 2021 WL 3612753, at *4 (8th Cir. Aug. 16, 2021) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993)). First, the testimony must be relevant in that it helps determine an ultimate issue of fact. *Id.* (citation omitted). Second, the expert must be qualified to offer the opinion. *Id.* (citation omitted). Third, the testimony must be reliable or trustworthy evidence. *Id.* (citation omitted).

Case law after *Daubert* shows that courts liberally admit evidence under Rule 702. *Lauzon*, 270 F.3d at 686 (citing *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991)); *Johnson v. Mead Johnson & Co.,* 754 F.3d 557, 562 (8th Cir. 2014) ("cases are legion that, correctly, under *Daubert,* call for the liberal admission of expert testimony.") (collecting sources).

### III. Discussion

#### A. Whether Morris' Opinions Regarding Dr. Khan are Admissible (Opinion Nos. 1 and 3)

In his first opinion, Morris opines that Dr. Khan should have followed up and removed Leus' IVC filter when he determined Leus would not undergo surgery. In his third opinion, Morris states it cannot be ruled out that Dr. Khan may have tilted the IVC filter upon implantation.

##### 1. Whether Morris' Opinions Regarding Dr. Khan Violate a Stipulation Between the Parties (Opinion Nos. 1 and 3)

Leus argues that Morris' opinions regarding Dr. Khan violate a previously signed stipulation because they allocate fault to Dr. Khan. Leus previously brought and subsequently dismissed a case against Dr. Khan and Bard in a New Jersey Supreme Court. *See George Leus v. Aftab Khan, M.D.*, No. CUM-L-00830. As part of the consideration for that dismissal, Bard signed

a stipulation that states, "Defendants further agree not to allocate any fault to . . . Khan and Khan Surgical Associates . . . during any trial in this matter." Doc. 222-3 (Stipulation), at 1.

Bard first contends that this argument is inappropriate for a *Daubert* motion because it does not relate to whether Morris' opinion is reliable or relevant. However, Leus did not bring a "*Daubert*" motion; he brought a "Motion to Exclude or Limit the Opinions and Testimony of Christopher Morris, M.D." Doc. 221. Bard provides no support for its contention that arguments to strike testimony because it violates *Daubert*'s mandates must be segregated from arguments that the testimony is otherwise inadmissible. Furthermore, it would be a waste of time and resources to force Leus to bring, and the Court to decide, multiple motions to exclude the same piece of testimony for different reasons. Consequently, the Court will decide if Morris' testimony violates the parties' stipulation.

In his first opinion, Morris states, "Dr. Khan should have followed up with Mr. Leus and he should have removed the Bard G2 filter" because his planned bariatric surgery was never performed. Doc. 377-2, at 49. In his third opinion, Morris states that it cannot be ruled out that Dr. Khan tilted the IVC filter during implant and consequently, "Dr. Khan may have placed the Bard G2 IVC filter into Leus with an anterior tilt." *Id.* at 51.

Leus argues that these opinions violate the stipulation because they allocate fault to Dr. Khan. Bard argues that they are not allocating fault but rather are arguing that Khan's actions are alternative, superseding, or intervening causes.

When interpreting a contract, like the stipulation here, the Court's goal is to effectuate the intent of the parties, and if a contract is unambiguous, "'the intent of the parties is to be discerned from the contract alone[,]' based on the plain and ordinary meaning of the contract's language." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. 2012) (quoting *DeBaliviere Place*

4

*Ass'n v. Veal*, 337 S.W.3d 670, 676 (Mo. 2011)). To determine the plain and ordinary meaning of a contract's terms, courts can look at the term's dictionary definitions. *See Schler v. Coves N. Homes Ass'n*, 426 S.W.3d 720, 723 (Mo. Ct. App. 2014) ("the dictionary is a good source for finding the plain and ordinary meaning of contract language."). The Court should determine what dictionary definition to use based on the contract's context. *Id.*

In the context of the parties' stipulation, allocate means to "apportion . . . to particular person." *Allocate*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/allocate (last visited September 10, 2021). And fault means "responsibility for wrongdoing." *Fault*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/allocate (last visited September 10, 2021). For Morris' opinions to violate the stipulation they must apportion responsibility for wrongdoing to Dr. Khan.

Both of Morris' opinions violate the plain meaning of the stipulation. In Morris' first opinion he states that Dr. Khan, "*should* have followed up with Mr. Leus" and "*should* have removed the Bard G2 filter." Doc. 377-2, at 49. This opinion seeks to apportion responsibility for Leus' injuries to Dr. Khan for his failure to remove the filter, and suggests Dr. Khan did something wrong. In his third opinion, Morris opines that Dr. Khan may have tilted Bard's filter. This opinion is also trying to apportion responsibility for Leus' injuries to Dr. Khan by suggesting that Dr. Khan's fault caused Leus' injuries not Bard. Both opinions are attempting to shift responsibility for injuring Leus from Bard to Dr. Khan, as such, both opinions "allocate fault" to Dr. Khan and are barred by the parties' stipulation.

Bard argues that Morris is not attempting to allocate fault, rather he is trying to show that Dr. Khan was an alternative or superseding cause of Leus' injuries. However, Bard does not explain how an opinion that expressly attributes wrongdoing to Khan is not an allocation of fault

5

but merely an opinion about causation. Further, it is unclear what expertise Morris has to opine about causation if it is unrelated to what Khan did wrong as a doctor.

For the reasons stated above, Morris opinions regarding Dr. Khan violate the stipulation, and should be struck; Leus' motion to strike Opinion No. 1 and the relevant portion of Opinion No. 3 is granted.

Finally, even if the Parties' stipulation did not bar Morris' opinion that Dr. Khan should have removed the filter, the opinion should be excluded because it could either be misleading or unhelpful to the jury. This is because Morris does not identify any standard of care that Dr. Khan was required to meet. He merely says Dr. Khan "should" have removed the filter. Without a standard of care opinion, a juror could conclude Dr. Khan was responsible merely because the filter was in Leus' body when Leus was allegedly injured by Bard's filter, i.e., but for the filter being there, Leus would not have been injured. In that case, Morris' testimony would be unhelpful to the jury because that conclusion is well within the understanding of a layperson. If on the other hand, Bard is concluding that Dr. Khan was negligent, there is no standard of care provided by Morris' opinion that would cabin the jury's speculation. Dr. Morris' opinion therefore is either unhelpful or confusing and will be stricken.

Bard also argues that it is simply providing rebuttal evidence to the argument that Dr. Khan's actions were proper. However, to date, the Court has not ruled that Leus' expert testimony regarding Dr. Khan is relevant. Therefore, the Court reserves for another day the relevance of Leus' expert testimony concerning Dr. Khan.

### 2. Whether Morris' Opinions Regarding the Tilt of Bard's Filter are Admissible (Opinion No. 3)

In his third opinion, Morris states that Dr. Khan may have tilted Bard's filter on implant. Doc. 377-2, at 51. Morris states this is the case because there is no "steep oblique or lateral imaging

6

projection from implant, post placement, or a CT scan immediately post implant." *Id*. I.e., there is no imaging that shows the filter was tilted or not tiled. As a result, Morris states he "cannot rule in or out" tilt at the time of implant. *Id*.

Leus argues that Morris' opinion that Dr. Khan may have tiled the filter at implantation is speculation because even Morris admits there is simply no evidence to show the position of the filter. The Court agrees.

Expert testimony must be based on "scientific, technical, or other specialized knowledge," and cannot be based on speculation. *See Masters v. City of Indep., Mo.*, 998 F.3d 827, 838 (8th Cir. 2021) ("[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case.") (citation omitted). Morris' opinion that Dr. Khan may have tiled the filter at implantation is necessarily conjecture because Morris has just admitted there is no way to tell if tilt occurred. This opinion is also unhelpful to the jury because if there is no way to tell if a tilt occurred, then a lay juror is able to understand that anything is possible and an expert opinion is unnecessary. As a result, Morris may not opine that he cannot rule out that Dr. Khan may have tilted the filter.

### B. Whether Morris has a Reliable Basis for his Opinion that Bard's Filter Could Not Have Been Tilted More than 14° (Opinion No. 3)

In Morris' third opinion he states that Bard's filter could not have tilted more than 14°. Leus argues that Morris has no basis for this determination. An expert's opinion should only be excluded if it is so fundamentally unsupported that it can offer no assistance to the jury. *Coutentos*, 651 F.3d at 820. And the factual basis for an opinion generally goes to that opinions' credibility not its admissibility. *Id.*

Morris determined that the filter could not have tilted more than 14° because, according to the Society of Interventional Radiology, a filter that tilts less than 15° will not have its clot-trapping

7

efficiency decrease, and there is no evidence in Leus' medical history that the clot-trapping efficacy of his filter decreased. *Id.* at 51-52. While Leus can press Morris on the strength of that opinion, the opinion cannot be said to have no basis or to be of no assistance to the jury. Leus' motion on this point is denied.

Leus also argues that this opinion is impermissibly vague and therefore is unhelpful to the jury. Morris' opinion is not vague. He states Bard's filter cannot be tilted more than 14°. He then states why he believes this—i.e. Bard's filter did not have a decrease in its clot trapping efficiency. Again, Leus can attack the strength of this opinion, but this opinion will help the jury determine if Bard's filter was tilted more than 14°, and Leus' motion on this point is denied.[1]

### C. Whether Morris has a Reliable Basis for his Opinion that Bard's Filter Prevented a Pulmonary Embolism (Opinion No. 3)

At the end of opinion No. 3, Morris states the IVC filter likely prevented a pulmonary embolism on July 18, 2012. Doc. 377-2, at 52. Leus argues that Morris has offered no methodology by which he comes to this conclusion. Morris determined the IVC filter trapped a blood clot by reviewing the relevant medical imaging. *See* Doc. 288-2 (Morris Affidavit), ¶ 6. Morris looked at images both above and below the IVC filter that showed differences in hounsfield units and the diameters of Leus' veins.[2] Doc. 288-2, ¶6; *see also* Doc. 377-2, at 54-55 (documenting the progression of Leus' thrombus below the IVC filter based on imaging Morris reviewed); Doc. 377-3, 52:14-54:7 (stating there was a difference in hounsfield units above and

---

[1] Leus also asserted that this portion of the opinion contradicted the opinion that Dr. Khan tilted the filter at the time of implant. Since the Court has stricken the portion of the opinion discussing Dr. Khan, it does not address whether these two pieces of the testimony are contradictory.

[2] Hounsfield units measure how much a part of the body reflects an X-ray or CT scan. Doc. 377-3, 50:23-51:20. Morris explained in his deposition that a bone would have a very high hounsfield unit where as a muscle would have a very low hounsfield unit. *Id*. Morris testified that because the IVC had the same hounsfield unit as the aorta he could conclude the IVC did not have DVT. Doc. 377-3, 52:14-53:1.

below the filter). Morris concluded that these differences indicated there was clotting below Leus' IVC filter but not above it and consequently the filter must have trapped Leus' blood clots. Doc. 288-2, ¶ 6.

Leus argues that Morris' opinion has no factual basis because he testified that (1) hounsfield units do a poor job of determining if a filter has stopped a blood clot and (2) there was no imaging evidence that the filter stopped a blood clot. *See* Doc. 377-3 (Morris Deposition), at 56:22-57:6, 57:13-15. However, as stated above, Morris did not only look at hounsfield units or whether the relevant imaging showed a blood clot in the filter. Morris also looked at the diameter of Leus' veins above and below the filter to determine whether there was clotting below the filter but not above it. While the concessions Leus highlights could diminish the strength of Morris' testimony, they do not render his opinion so fundamentally unsupported that it could provide no assistance to the jury. To the extent Leus wishes to attack the factual basis of Morris' testimony, such an attack should be done before the jury on cross-examination. *Coutentos*, 651 F.3d at 820 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility"). Leus' motion on this point is denied.[3]

### D. Whether Morris' Opinions Regarding Subsequent Medical Treatment are Relevant (Opinion Nos. 7, 8, and 9) [4]

Morris offers multiple opinions that criticize the quality-of-care Leus received after he reported to the hospital. Morris opines that Leus' health care providers should have diagnosed and started treating Leus' DVT earlier than they did because a simple ultrasound would have shown the DVT's existence. Doc. 377-2, at 56, 58. Furthermore, Morris states that if the DVT had been

---

[3] At oral argument, the Court asked whether this testimony was relevant to Bard's liability. Bard suggested that this issue was better addressed at the pre-trial conference or at trial. At Bard's invitation, the Court reserves for later the relevance of this testimony.

[4] Since the Court is striking Opinions 7-9, the Court will not consider Leus' remaining arguments in favor of striking them.

diagnosed earlier and the correct treatment performed, then Leus' DVT would not have developed into phlegmasia cerulea dolens and his legs may have been saved. *Id.* at 54-58.

Leus argues that these opinions are irrelevant. As stated above, for expert testimony to be admissible it must be relevant to the task at hand. *Daubert*, 509 U.S. at 597. Bard states these opinions are relevant because Bard is arguing Leus' health care providers are alternative and superseding causes of Bard's injuries.

As a preliminary matter, the Parties did not discuss the Missouri cases that address the relevance of medical care specifically provided after a tort injury has occurred. However, the Parties did discuss this issue contemporaneously in a similar motion related to Dr. Sarac, a different expert for Bard. The Court also gave the parties an opportunity after their oral argument to supplemental their Morris briefing to address the issue. In the interest of efficiency, therefore, the Court considers the issue here.

Missouri case law holds that once liability has been established a defendant is liable for the entirety of a plaintiff's damages, even those that result from an aggravation of a plaintiff's injuries due to the negligent provision of subsequent medical care; the initial negligence is the proximate cause of the entirety of the plaintiff's injuries. *See, e.g., State ex rel. Baldwin v. Gaertner*, 613 S.W.2d 638, 640 (Mo. 1981) (stating the initial tortfeasor is liable for plaintiff's total damages because the tortfeasor's original negligence is deemed to be the proximate cause of any subsequent aggravation); *State ex Rel. Blond v. Stubbs*, 485 S.W.2d 152, 154 (Mo. Ct. App. 1972) (reiterating the "firmly established" principle under Missouri law that "a defendant who negligently causes a personal injury is liable" for "aggravation due to negligence in the furnishing of the medical services"). Thus, contrary to Bard's argument any subsequent negligent treatment does not extinguish a defendant's liability because it is not an intervening cause of the plaintiff's injuries.

10

*See, e.g., id.* (stating subsequent medical treatment "is not considered to be an insulating intervening cause") (collecting cases); *State ex rel. Tarrasch v. Crow*, 622 S.W.2d 928, 932 (Mo. 1981) ("the subsequent negligent medical treatment is not considered to be an insulating intervening cause").

Consequently, if Bard's filter caused the initial injury, then, under Missouri law, the subsequent medical care Leus received for that injury is not an intervening cause and does not affect Bard's liability. *Staehlin v. Hochdoerfer,* 235 S.W. 1060, 1062 (Mo. 1921) (holding that a defendant who negligently caused an initial leg injury is liable for the loss of that leg even if the leg loss "resulted from the mistakes or want of skill of his physician.").

Leus alleges that Bard was the cause of his initial injury. Leus alleges Bard's defectively designed filter migrated, tilted, and then punctured his IVC. Doc. 4, ¶ 45. This puncture caused Leus' pain and internal bleeding that developed into Leus' DVT. *Id.* Morris opines that Leus' doctors should have diagnosed and treated his DVT quicker. However, if Leus' allegations are correct, then even if Leus' doctors were subsequently negligent and contributed to Leus' injuries, Bard is still liable for all of Leus' damages. *E.g.*, *Staehlin* 235 S.W. at 1062. On the other hand, if the jury finds Bard's filter was not defective and did not cause the bleeding and DVT in Leus' legs, then Leus will not be able to establish liability against Bard at all and any negligent treatment Leus subsequently received would likewise be irrelevant. Thus, Bard has not shown how Morris' opinions about the medical care Leus received could be relevant in this case. Moreover, at a minimum, this testimony would be confusing and misleading to the jury given Missouri caselaw.

Bard also argues that Morris' opinions are admissible because they involve events that occurred before Leus developed phlegmasia cerulea dolens, and certain "simple" medical actions taken "at any point on 7/16 or 7/17 or even the morning of 7/18 . . . likely would have led to Mr.

11

Leus keeping his legs." Resp. at 13.  But, as stated above, Leus alleges that the IVC filter tilted and punctured his IVC.  *See supra* Section I.A.  As a result of this initial puncture, Leus alleges he suffered from immediate back pain, internal bleeding, corresponding blood clotting that developed into DVT, and other symptoms.  *Id.*  Thus, Leus is alleged to have suffered an injury much earlier in the process than when he developed phlegmasia cerulea dolens.  If the jury accepts Leus' evidence and argument, then any later aggravation of that injury by subsequent medical care is irrelevant.  Further, if the jury rejects Leus' evidence or concludes the Bard device was not the cause of Leus' blood clots and DVT, then evidence of subsequent medical medial care is also irrelevant.

Bard also argues that this testimony should be allowed because Missouri law allows expert testimony on alternative causation.  Resp. at 12 (*citing Roberts v. Mo. Highway & Trans. Comm.*, 222 S.W.3d 322, 333 (Mo. App. Ct. 2007)).  However, in *Roberts*, the testimony went to the underlying cause of the plaintiff's injuries.  *Roberts*, 222 S.W.3d at 333 (allowing defendant's expert to testify that plaintiff's back injury was caused by horseback riding instead of a workplace injury).  As explained above, testimony regarding alternative causation of the initial injury would have been acceptable.  But Morris' opinions regarding the treatment Leus received *after* he developed DVT go not to the underlying cause of Leus' injuries, but rather, to the aggravation of that injury.

Bard argues that Morris' opinion is an admissible rebuttal to Dr. Muehrcke's report.  In Dr. Muehrcke's report he states, "Mr. Leus developed phlegmasia cerulea dolens causing arterial ischemia, which required bilateral above the knee amputations, and scrotectomy.  There were no other reasonable treatment options other than bilateral below the knee amputations." Doc. 240-2, at 13.  However, the relevance of Dr. Muehrcke's opinions is not currently before the Court and it

12

reserves that determination for a later time, if raised by the parties. However, if Dr. Muehrcke's opinion is submitted to the jury at trial, the Court's orders striking Dr. Morris' opinion on this subject will be reconsidered.

The supplemental authority cited by Bard after oral argument, does not change the Court's understanding of the issue. Most of the cases only supported the proposition that a defendant is allowed to argue alternative causation of a plaintiff's initial injury. *Hanifi v. Ethico, Inc.*, No. 4:20-cv-527, 2021 WL 640827 (W.D. Mo. Feb. 18, 2021) (defendant was allowed to argue it was plaintiff's neuroma and not defendant's product that caused her injuries); *Mengwasser v. Anthony Kempker Trucking Inc.*, 312 S.W.3d 368 (Mo. Ct. App. 2010) (defendant was allowed to argue it was the driver of plaintiffs' car and not defendant who was negligent); *Whisenand v McCord*, 996 S.W.2d 528 (Mo. Ct. App. 1999) (question was whether third party's negligence in not pulling their car completely off the shoulder or defendant's negligence was the cause of plaintiff's injuries); *Sherrer v. Bos. Sci. Corp*, No. 1216-CV-27879, Order on Motions in Limine (Cir. Court Jackson County, Mo. Nov. 30, 2015).[5] As stated above, that line of cases is inapplicable because the testimony here regards the alleged aggravation of an injury not the cause of the initial injury.

In *Boehmer v. Boggiano*, 412 S.W.2d 103 (Mo. 1967), the plaintiff was in a car crash and subsequently had spinal surgery. Defendant's experts testified that the method plaintiff's doctor used to determine plaintiff needed spinal surgery was unreliable and that the accident caused her no spinal damage. *Id.* at 107. The *Boehmer* opinion reiterated and confirmed the principle that a

---

[5] The opinion in *Sherrer* is a list of rulings on several motions in limine and the relevant portion is only two sentences long with no case citations. It is not possible to determine the exact reasoning behind the Court's decision, but the briefing indicates that the defendant in *Sherrer* was arguing the negligent medical care was the cause of plaintiff's injuries not that it aggravated those injuries. Doc. 399, at 38 (Defendant's brief states, "Plaintiff also pointedly ignores the testimony of Bard's experts, who attribute Plaintiff's foreshortened vagina solely to the sacrospinous vault suspension performed by Dr. Raz.").

13

defendant who causes a plaintiff's initial injury is liable for the aggravation of that injury by negligent health care professionals. *Id.* at 108-09 (collecting cases). However, the court there found the evidence was admissible because defendant's experts were disputing whether there was any damage at all. *Id.* at 109-10. Since proving damages is one of the requirements of plaintiff's prima facie case, defendant was allowed to provide evidence to rebut it. *Id. Boehmer* is not applicable here because Morris' opinions regarding Leus' medical care was not meant to dispute whether Leus suffered an injury; rather it is an attempt to blame others for the aggravation of the injury. This authority does not persuade the Court, and Leus' motion to strike Opinion Nos. 7-9 is granted.

### E. Whether Morris is Qualified to Discuss the Causes of Leus' Back Pain (Opinion No. 11)

Morris states that Bard's filter did not cause or contribute to Leus' back pain. Doc. 377-2, at 59. Leus argues that Morris is not qualified to diagnose the causes of Leus' back pain because he is not board certified in orthopedic surgery, neurology, or neurosurgery. An expert's testimony should be excluded if he does not have sufficient expertise in the areas about which he opines. *See Jenkins v. Ark. Power & Light Co.*, 140 F.3d 1161, 1165 (8th Cir. 1999). Furthermore, a doctor's opinion should not be excluded merely because it involves a field of medicine that he does not specialize in. *See Harris v Smith*, 372 F.2d 806, 813-14 (8th Cir. 1967) (reversing district court's exclusion of evidence because it was based on the fact that the doctor was not a specialist in the relevant school of medicine). And "[a]n individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) (collecting cases).

14

Morris testified that he "regularly assess[es] and assist[s] with the diagnosis of back pain" by reviewing "diagnostic imaging of patients who present with spine and back related injuries." Doc. 288-2 (Morris Affidavit), ¶ 3. Given his experience diagnosing back pain, Morris is qualified to opine on the cause of Leus' back pain. Leus' motion on this point is denied.

### F. Whether Morris is Qualified to State Leus' Anxiety and Depression was not Impacted by his Injuries (Opinion No. 12)

In his twelfth opinion Morris states, "Mr. Leus' anxiety and depression was not caused or contributed to by his G2 IVC Filter." Doc. 377-2, at 60. Leus argues that Morris is not qualified to opine as to the cause of Leus' anxiety and depression because he is not a psychiatrist or a psychologist. As previously discussed, a doctor is not barred from providing expert testimony merely because an issue involves a different field of medicine than the one he practices. *Harris*, 372 F.2d at 814. And an individual can be qualified to provide expert testimony based on experience alone. *Fox*, 906 F.2d at 1256. Thus, the question before the Court is whether Morris has sufficient experience to be qualified to determine that Leus' injuries did not impact his mental health. The Court finds he does not.

Morris states in his affidavit that part of his practice is the "evaluation and management of medical and psychosocial disorders." 288-2, ¶ 3. Morris' affidavit also states he has experience determining if a patient's mental health issues relate to their injuries. *Id.* But here he is opining that Leus' injuries did not cause or contribute to Leus' depression. Bard's counsel was asked at oral argument what type of assessments Morris did regarding a patient's mental health. She answered that Morris is required to determine if a patient is depressed when determining what course of treatment to prescribe. Bard's counsel confirmed that when making these evaluations Morris did not determine what the cause of a patient's mental health issues were. Additionally, Morris conceded his lack of expertise in disentangling the different causes of a patient's mental

15

health issues in his deposition when he stated he was not an expert on "telling a jury in this case the impact of that old history on the psychological impact that that loss of both of his legs have had on him." Doc. 377-3, at 102:7-13. While Morris has experience diagnosing whether a patient is depressed, Bard has not met its burden of showing Morris has experience determining that a patient's depression was aggravated by subsequent events such as losing one's legs. Therefore, Morris' affidavit testimony is insufficient to meet Bard's burden to show it is more likely than not that Morris is qualified because Bard has not demonstrated Morris has experience diagnosing the cause of a patient's depression. Leus' motion to strike Opinion No. 12 is granted.

IV. **Conclusion**

For the reasons explained above, Leus' Motion to Exclude or Limit Opinions and Testimony of Christopher Morris, M.D., Doc. 221, is granted in part and denied in part. Morris will not be allowed to testify about the following: Dr. Khan's actions (Opinion No. 1 and portion of Opinion No. 3); the quality-of-care Morris received after he developed DVT (Opinion Nos. 7-9); or whether Leus' injuries contributed to his anxiety and depression (Opinion No. 12). Morris will be allowed to testify that the filter could not have been tiled more than 14° (portion of Opinion No. 3); that the filter prevented a pulmonary embolism (portion of Opinion No. 3); and that Bard's filter did not contribute to Leus' back pain (Opinion No. 11).

**IT IS SO ORDERED**.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 22, 2021
Jefferson City, Missouri